James W. RILEY, Defendant-Appellant,

v.

STATE of Delaware, Plaintiff-Appellee.

Supreme Court of Delaware.

Submitted: July 9, 1984.

Decided: July 12, 1985.

Robert B. Young (argued) of Young and Schwartz, John Williams (argued) of Prickett, Jones, Elliott, Kristol & Schnee, Dover, for defendant-appellant.

John A. Parkins, Jr. (argued), Former Chief of Appeals Div., Dept. of Justice, Wilmington, Gary A. Myers (argued), Deputy Atty. Gen., Georgetown, Deborah A. Blom, Deputy Atty. Gen., Wilmington, for plaintiff-appellee.

John Williams of Prickett, Jones, Elliott, Kristol & Schnee, Dover, for amicus curiae American Civil Liberties Union of Delaware, Inc.

Before HERRMANN, Chief Justice, McNEILLY, HORSEY, MOORE and CHRISTIE, Justices, constituting the Court en Banc.

HORSEY, Justice:

Defendant, James W. Riley, seeks reversal of his conviction in a jury trial of two counts of Murder in the first degree (11 *Del.C.* § 636),[1] Conspiracy in the second degree (11 *Del.C.* § 512(1)), Possession of a deadly weapon during commission of a felony (11 *Del.C.* § 1447(a)), and Robbery in the first degree (11 *Del.C.* § 832(a)(2)). On appeal, defendant asserts multiple grounds for reversal. These include potential jury prejudice, abusive discretionary rulings, and the use of the underlying felony both as an element of felony murder and as an aggravating circumstance for the imposition of the death penalty. We find no reversible error as to the conviction and, therefore, we affirm.

Codefendants, Tyrone Baxter and Michael Williams, testified for the State as follows: On February 8, 1982, Baxter and Riley decided to rob a liquor store. Williams drove Riley and Baxter to the store, waited in the automobile, and after the robbery, drove them to a bus station. Inside the liquor store, Riley placed a quart bottle of beer on the counter and paid for it. When the store owner, James Feeley, opened the cash register, Riley drew a pistol and removed approximately $150 from

---

1. Defendant was convicted of intentional murder and felony murder pursuant to 11 *Del.C.* §§ 636(a)(1) and 636(a)(2), which provide:

§ 636. **Murder in the first degree; class A felony.**

(a) A person is guilty of murder in the first degree when:

(1) He intentionally causes the death of another person;

(2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person.

the register. Riley attempted to take Feeley's wallet but Feeley resisted. At Baxter's urging, Riley shot Feeley in the leg. As Baxter and Riley were leaving, Feeley threw a wine bottle at Riley. Baxter ducked behind a cigarette machine. Riley then shot Feeley in the chest at close range. Baxter and Riley fled, leaving the victim mortally wounded.

Riley pleaded not guilty to each of the five charges against him. He testified that he was in Philadelphia the entire day of the robbery. Riley's fingerprints, however, were on the beer bottle found on the store counter. No alibi witnesses testified for Riley. Tyrone Baxter's mother testified that Riley had spent the night before the robbery in her house in Dover. Riley denied it. Gary Walter Momenko, an inmate at the Delaware Correctional Center, testified that Baxter had told him that he, Baxter, not Riley, shot Feeley.

The jury found Riley guilty on all charges. The State sought and obtained the death penalty only for felony murder, not for intentional murder.

## I

Defendant first contends that the Trial Judge abused his discretion in the conduct of *voir dire* by excusing for cause two venirepersons who allegedly failed to demonstrate their unequivocal opposition to the death penalty. Defendant claims these dismissals violated his Sixth and Fourteenth Amendment right to an impartial jury under the standards set forth in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Applying *Witherspoon* as clarified or modified by *Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) we cannot conclude that the Trial Court abused its discretion or committed reversible error in excusing for cause the venirepersons in question.

## A.

In *Wainwright,* the Supreme Court recently reviewed and modified "the standard for judging the proper exclusion of a juror

opposed to capital punishment." 105 S.Ct. at 849. We refer to the standard which the Supreme Court had defined 17 years earlier in *Witherspoon.* In *Witherspoon,* the Court concluded:

> that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

391 U.S. at 522, 88 S.Ct. at 1777. At the same time, the Court in *Witherspoon* acknowledged a state's legitimate interest in administering an otherwise lawful death penalty scheme:

> [N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* (emphasis in original)

*Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21. The Court thus attempted to strike a balance between a defendant's right to have a jury not "uncommonly willing to condemn a man to die," *Id.* at 521, 88 S.Ct. at 1776, and a state's legitimate "quest for a jury capable of imposing the death penalty." *Id.* at 520–521, 88 S.Ct. at 1776. The Court summarized its position:

> The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that

veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if the applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion.

*Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original).

As Justice Rehnquist stated, writing for the majority in *Wainwright, Witherspoon* struck down as unconstitutional Illinois' statutory sentencing procedures which resulted in the excusal for cause of nearly half the veniremen because they "expressed qualms about capital punishment." 391 U.S. at 513, 88 S.Ct. at 1772. Under Illinois statutes governing trials for murder, the State was permitted to challenge for cause any juror stating either "that he ha[d] conscientious scruples against capital punishment, or [who was] opposed to the same." 391 U.S. at 512, 88 S.Ct. at 1772. Thus, the Court in *Witherspoon* held that a jury chosen under the Illinois statutes in question "would not be the impartial jury required by the Sixth Amendment, but rather a jury 'uncommonly willing to condemn a man to die.'" *Wainwright v. Witt,* 105 S.Ct. at 849, quoting *Witherspoon v. Illinois,* 391 U.S. at 521, 88 S.Ct. at 1776.

*Witherspoon* was thereafter construed as permitting jurors to be excluded from a capital case for cause *only if* the jurors made it "unmistakably clear [either] (1) that they would *automatically* vote against the imposition of capital punishment without regard to [the] evidence ... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21; *Witt v. Wainwright,* 11th Cir., 714 F.2d 1069, 1076 (1983), *modified,* 723 F.2d 769 (1984). *See also Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); *Maxwell v. Bishop,* 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970).

Reversing the Eleventh Circuit in *Witt v. Wainwright, supra,* the Supreme Court ruled that the Eleventh Circuit's construction of *Witherspoon* was erroneous. The Court held that the "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment," 105 S.Ct. at 852, is stated in *Adams v. Texas, supra.* "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" The Court thus "[dispensed] with *Witherspoon's* reference to 'automatic' decision-making [and the requirement] that a juror's bias be proved with 'unmistakable clarity.'". 105 S.Ct. at 852.[2]

The Court in *Wainwright* thus discarded *Witherspoon's* "requirements" that a veniremember be excluded for cause only upon an "unmistakably clear" showing either that the prospective juror would be unable to abide by existing law or that he would *automatically* vote against the imposition of capital punishment regardless of the evidence of guilt.

Characterizing the *Witherspoon* standard for excluding a juror for cause as unduly rigid, the Supreme Court in *Wainwright* opted for a single, more elastic standard for excusal with respect to views on capital punishment: "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 105 S.Ct. at 852. The Court reasoned that:

**2.** The Supreme Court thereby affirmed the Florida State trial court's excusal for cause of a prospective juror who said that she was "afraid" that her personal feelings about capital punishment would interfere with her ability to be an impartial juror. When asked whether her beliefs would interfere with determining the guilt or innocence of the defendant, the juror answered, "I think so."

[D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot·be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing death sentence, or may be unable to articulate, or may wish to hide their true feelings.

*Id.*

### B.

◼ The primary purpose of *voir dire* under Delaware law is to elicit a juror's want of bias or prejudice and thus secure for the defendant a jury able to vote impartially upon the evidence and the law as presented at trial. *Parson v. State*, Del. Supr., 275 A.2d 777 (1971). Balancing a defendant's right to a competent, impartial jury is the state's right to empanel jurors who can "follow their instructions and obey their oaths." *Adams v. Texas*, 448 U.S. at 44, 100 S.Ct. at 2526. Superior Court Criminal Rule 24(a), in pertinent part, states that, "the Court shall permit or conduct such examination as is reasonably calculated to ascertain prejudice of a juror."

◼ In the conduct of *voir dire*, the trial court has broad discretion in determining whether a prospective juror should be excused for cause. *Parson v. State, supra.* The court's exercise of its discretion will be overturned only upon a showing of abuse and consequent prejudice. *Ross v. State*, Del.Supr., 482 A.2d 727 (1984); *Hickman v. State*, Del.Supr., 431 A.2d 1249 (1981);

*Hooks v. State*, Del.Supr., 416 A.2d 189 (1980).

11 *Del.C.* § 3301 establishes the parameters by which the trial court can determine through *voir dire* the qualification of jurors to sit in capital cases; and in *Hooks*, this Court found § 3301 to be consistent with *Witherspoon*. 416 A.2d 194.

### C.

In this case, the Trial Court began its *voir dire* examination by directing general questions to the entire array. Based on their answers, certain prospective jurors were excused and others were reserved. Juror Mae Floyd was "reserved" because she responded that she knew one of the codefendants, Tyrone Baxter. Venireman Gerald Mood was also "reserved" because he stated that he knew one of the policemen involved in the case and that he had read newspaper reports about the case published before trial. Thereafter, the Court individually examined each member of the array whose name had been drawn to sit in the case, including Mood and Floyd. To each of the prospective jurors, the Court posed two questions for the purpose of determining their attitudes towards capital punishment. Those questions were:

(1) Do you have any conscientious scruples against finding a verdict of guilty where the punishment might be death or against imposing the death penalty if the evidence in the case shall so warrant? (2) Regardless of any personal benefits or feelings that you may have, if the evidence justified it, would you be able to find a person guilty of murder in the first degree and would you be able to impose the death penalty?[3]

---

3. Both questions were clearly designed to comply with 11 *Del.C.* § 3301 and clearly represented a parsing of the second and third sentences thereof. Section 3301 provides:

When a juror is called in a capital case, he shall be first sworn or affirmed upon the voir dire and then asked, under the direction of the court, if he has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at bar. If his answer is in the negative,

he shall be sworn as a juror in the case, unless he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant him, or unless he shall be peremptorily challenged, challenged for cause or excused by consent of counsel on both sides. If his answer to the question be in the affirmative, he shall be disqualified to sit in the case, unless he shall say, upon his oath or affirmation, to the satis-

Eight jurors, including Floyd and Mood, were excused for cause by reason of their answers. Defendant claims reversible error only in the exclusion of jurors Mood and Floyd.

Mood's *voir dire* consisted of the following:

> **The Court:** I am going to ask you next several questions dealing with your attitude towards capital punishment. Do you have any conscientious scruples against finding a verdict of guilty when the punishment might be death or against imposing the death penalty if the evidence should so warrant?
>
> **Mr. Mood:** *I don't know, I have mixed emotions about that.*
>
> **The Court:** Regardless of any personal belief or feeling that you may have, if the evidence justified it, would you be able to find a person guilty of murder in the first degree and would you be able to impose the death penalty?
>
> **Mr. Mood:** *Maybe I could. I don't really know.*
>
> **The Court:** I am going to excuse you sir, and you will report tomorrow morning at 10:00. The last juror was excused for cause.

The dismissal of Floyd was based on the following exchange:

> **The Court:** Now, I am going to ask you several more questions and those questions deal with your attitude towards capital punishment. Do you have any conscientious scruples against finding a verdict of guilty where the punishment might be death or against imposing the death penalty if the evidence should warrant?
>
> **Ms. Floyd:** I would say yes, *I think so.*
>
> **The Court:** You do have conscientious scruples?
>
> **Ms. Floyd:** *Yes.*
>
> **The Court:** Regardless of any personal beliefs or feelings you have, if the evidence justified it, would you be able to find a person guilty of murder in the first degree and impose the death penalty?
>
> **Ms. Floyd:** That is a hard one to tell you the truth.
>
> **The Court:** I will repeat the question.
>
> **Ms. Floyd:** I heard it. All right. Repeat the question.
>
> **The Court:** I will repeat it. Regardless of your personal belief or feelings, if the evidence justified it, would you be able to find a person guilty of murder in the first degree and would you be able to impose the death penalty?
>
> **Ms. Floyd:** That is a two-part question, right?
>
> **The Court:** Yes, it is.
>
> **Ms. Floyd:** The latter part—
>
> **The Court:** First of all, would you be able to impose the death penalty?
>
> **Ms. Floyd:** I tell you the truth *I don't think so.*
>
> **The Court:** I will excuse you. Thank you very much.
>
> I will note your continuing objection, Mr. Young.

Defendant's quarrel is not with the Court's framing of its questions or its compliance with § 3301, but rather that the prospective jurors' answers were insufficient to justify their excusal for cause under § 3301 and *Witherspoon.* Defendant also concedes that to reverse we must find an abuse of discretion within the context of *Witherspoon.*

■ Whatever merit there may have been to defendant's claim for reversible error based on inadequate examination of jurors Mood and Floyd is resolved by *Wainwright.* The responses of prospective jurors Mood and Floyd are strikingly similar to those of the prospective juror whose excusal for cause was recently affirmed in *Wainwright v. Witt, supra.* While Mood's initial answer to the Court's questioning

---

faction of the court, that he feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event he shall be a competent juror, if not otherwise disqualified, challenged or excused.

could have been construed as equivocal, his repetition of his "I don't know" response supports the inference that Mood's answer represented an understatement of his beliefs. Floyd's similarly qualified responses —"That is a hard one to tell you the truth" and "I tell you the truth I don't think so"—permit a similar inference: that his views "would prevent or substantially impair the performance of [his] duties as a juror" under *Witherspoon* as modified by *Wainwright*. The Court was not required to establish the bias of these jurors with "unmistakable clarity." 105 S.Ct. at 852. Given the Court's reservation of jurors Mood and Floyd on other grounds, clearly we cannot conclude that the Court abused its discretion in excusing jurors Mood and Floyd for cause.

## II

Defendant raises a related contention that the Trial Judge violated his Sixth and Fourteenth Amendment right to trial by an impartial jury by refusing to inquire on *voir dire* as to the religious affiliation of each prospective juror.

The issue of possible religious bias was raised before trial by the defense and centered upon the fact that the victim and the members of his family were Roman Catholic and had close associations with the Holy Cross Roman Catholic Church in Dover. Defendant established that the victim was a member of that church; that two of his children attended the church's parochial school; and that, apart from the church's memorial service for victim, the church had conducted a fund raiser to aid the victim's children, orphaned as a result of his death. On this basis, defendant contends that the Court abused its discretion in declining to include in its general *voir dire* to the array the following questions posed by defendant:

Are you Roman Catholic?

Are you associated with anyone whom you understand to be Roman Catholic?

Are you friends with anyone whom you understand to be Roman Catholic?

The State objected to these inquiries on the grounds that they were unconstitutional and irrelevant. The Court sustained the objection but then posed the following question to the panel:

Were you involved or did you in any way contribute to, [or] take part in any series of fund raisers or activities sponsored or assisted by or associated with the Holy Cross Church or School in connection with the family of James E. Feeley, Sr.?

■ The trial court has broad discretion in determining the scope and form of questions to be asked on *voir dire*, subject to the essential demands of fairness. *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); *Wright v. State*, Del.Supr., 374 A.2d 824, 829 (1977); *Parson v. State*, 275 A.2d at 780. Defendant has no right to have all proposed *voir dire* inquiries asked by the court. *Wright v. State, supra* at 829. A judicial ruling on the scope of *voir dire* questioning will not be overturned absent an abuse of discretion prejudicing defendant's rights. *Parson v. State, supra* at 781.

■ As a general rule, a person otherwise competent to serve on a jury is not disqualified from sitting merely because of religious beliefs or associations. *Coleman v. United States*, D.C.App., 379 A.2d 951, 953 (1977). However, religious affiliations of prospective jurors may be a proper subject of *voir dire* examination if: (1) religious beliefs are involved in an issue in the case; (2) a religious organization is a party to the litigation; or (3) "special circumstances" raise the possibility of religious prejudice. *See, e.g., United States v. Wolters*, 9th Cir., 656 F.2d 523 (1981); *United States v. Barnes*, 2d Cir., 604 F.2d 121 (1979); *People v. Velarde*, 200 Colo. 374, 616 P.2d 104 (1980); *State v. Wright*, Mo. App. 619 S.W.2d 822 (1981). *See generally* 47 Am.Jur.2d *Jury* § 283 (1969).

Defendant argues that the Court's refusal to include in its *voir dire* the specific questions framed by defendant constituted an abuse of discretion. We disagree.

■ In our opinion, the Trial Court properly exercised its discretion in tailoring the question of the victim's religious affiliation, and that of his family, to more properly fit the circumstances of the case. *See, e.g., United States v. Baker,* 10th Cir., 638 F.2d 198, 201 (1980). In our view, the questions as framed by defendant were clearly improper. *See Coleman v. United States, supra.* The Court was not required to adopt defendant's proposed *voir dire* as its own, *Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973); and in our view, the Court's reformulation of defendant's *voir dire* accomplished all that defendant could properly have sought under the authorities cited above. As defendant failed to establish an abuse of discretion or resulting prejudice, this basis for reversal fails.

### III

We here review defendant's motion to discharge the venire for racial imbalance, which defendant renewed after the jury was drawn. We then consider defendant's enlarged claim, first stated on appeal, that the State exercised its peremptory challenges for racial reasons. We find no basis for reversible error in any of these related issues.

### A.

On the eve of trial and the Court's conduct of *voir dire,* defendant moved "to disqualify the jury panel presently assembled." Defendant did not attack the original array or venire. Rather, he claimed that the panel had later become racially disproportionate because the Court excused from service a substantial number of the prospective jurors. The defendant did not object to the array as drawn, summoned and assembled, which contained 16% blacks and the remainder, whites. The thrust of defendant's objection was that, through ju-

dicial excusal of jurors for personal reasons, the remaining blacks had been reduced to an unacceptable number amounting to about 9% of the remaining venire. Defendant's contention was that the venire had become "unconstitutionally disproportionate" for the trial of a young black charged with killing a middle-aged white shopkeeper.

Defendant's motion contained no supporting affidavit showing either statistics as to the racial composition of other jury panels within the county or vital statistics as to the county's population by race.

At a hearing on the motion, opposed by the State, defendant did not charge, or even imply, that the Trial Judge had excused jurors on racial grounds. Defendant simply asserted that it would be "unfair" for the jury to be drawn from the remaining array and that a new array should be drawn.

When asked by the Court what he considered to be an acceptable percentage of blacks, defendant expressed his belief that black representation on the panel should range between 15% and 20% to reflect "the mix of the community." [4] Apart from asserting that his constitutional rights were violated, defendant did not articulate any precise constitutional or statutory basis for his argument. On that record, the Trial Court, in a bench ruling, summarily denied defendant's motion and proceeded with *voir dire* and the empanellment of the jury.

After the jury was drawn, defendant orally renewed his previous motion.[5] The motion was again summarily denied.

On this record, defendant now constructs two Federal constitutional arguments and one State statutory ground for sustaining his challenge to the pre-*voir dire* panel. Defendant asserts that refusal to dismiss the panel deprived him of either his federal constitutional equal protection right or his Sixth Amendment right to a jury represent-

---

4. The parties apparently agreed that adult blacks then represented about 18% of the adult population within Kent County, the place of trial.

5. See section III–B relating to defendant's motion renewed after empanellment of the jury.

ing a fair cross section of the community. Defendant also asserts that discharge of the jury was required under Delaware statute law, 10 *Del.C.*, chapter 45.

The State makes a three part response: (A) that defendant's constitutional objections were not articulated and fairly presented at trial, depriving the State of an opportunity to rebut defendant's required *prima facie* showing. (B) In any event, defendant failed to make a *prima facie* showing *either* of denial of equal protection through State discrimination in the jury selection process *or* the systematic exclusion of blacks from the venire so as to deprive defendant of a jury drawn from a fair cross section of the community. (C) 10 *Del.C.*, chapter 45 has no application to a claim of racial imbalance in the venire resulting from the Court's excusal of prospective jurors solely for personal reasons.

On the record before us, we find no error of law or abuse of discretion in the Trial Court's refusal to discharge the venire. Assuming *arguendo* that the constitutional issues were fairly presented, the State's contentions that defendant failed to make a *prima facie* showing of either an equal protection or a Sixth Amendment violation are well taken.

Under the Sixth Amendment, every defendant is entitled to a trial before a fair and impartial jury. The United States Supreme Court has interpreted this Sixth Amendment right to include the "essential component" of a petit jury selected from a representative cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 526–528, 95 S.Ct. 692, 695–697, 42 L.Ed.2d 690 (1975). To this end, the *Taylor* Court expressed the view that distinctive groups may not be systematically excluded in the jury selection process without jeopardizing a criminal defendant's right to an impartial jury trial. *Id.*

To establish a *prima facie* case of violation of the Sixth Amendment requirement that a jury represent a fair cross section of the community, *Strauder v. West Virginia*, 100 U.S. 303, 10 Otto 303, 25 L.Ed. 664

(1879), a defendant must show, "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires ... is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

■ Both parties concede that requirement (1) is satisfied. However, they disagree with respect to fulfilling requirements (2) and (3). The defendant contends that his statistical presentation meets these requirements. However, defendant's factual presentation is entirely inadequate to sustain such a Sixth Amendment claim. By contrast, in *Duren*, the petitioner demonstrated that a "large discrepancy occurred *not just occasionally* " (emphasis added), *id.*, at 366, 99 S.Ct. at 669; and, the Court found that petitioner had made a *prima facie* showing of a Sixth Amendment violation. Here, defendant's analysis is confined to one jury venire. It is well established that statistics based on a single venire are insufficient to establish a systematic underrepresentation. *Euell v. Wyrick*, 8th Cir., 714 F.2d 821, 822–23 (1983). Simply proving a substantial reduction in blacks within the venire as a result of excusals granted by the Court for personal reasons, or for cause, clearly does not satisfy the three-prong showing of *Duren*.

■ Turning to defendant's Fourteenth Amendment equal protection contention, it is clear that he has alleged no State action in which this Court might possibly find grounds for error. Defendant does not argue that the selection of the original jury wheel (producing a qualified jury pool consisting of 16% black members) was susceptible to exclusions based upon race. Nor does the defendant contend that the Trial Judge exercised his excusal power for racially motivated purposes. Moreover, we note that the prospective jurors, and not

the Court, initiated the excusals which resulted in the underrepresentation of blacks giving rise to defendant's complaint. The defendant can rely only on the point that blacks were underrepresented in the venire *after* the Court excused prospective jurors for personal reasons, to which defendant did not object. This is clearly insufficient to constitute State action.

Defendant's reliance on *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), is also misplaced. In *Alexander*, the jury panel was selected at random from questionnaires containing a clearly visible racial designation—a process which the Supreme Court found highly suspect. By contrast, in Delaware panel members are randomly selected from a qualified jury wheel which contains only the names and addresses of the potential jurors and juror questionnaires are not used at this point.

We take up defendant's final contention that the jury selection process violated 10 *Del.C.* § 4501, *et seq.*[6] Defendant argues that empanelling an all-white jury deprived him of his right to a jury drawn from a fair cross section of the community contrary to 10 *Del.C.* § 4501, *et seq.* We disagree.

■■■ Since 10 *Del.C.* § 4501 is functionally equivalent to the Sixth Amendment fair cross section requirement of *Taylor*, the basis upon which we rejected defendant's Sixth Amendment contention has similar application here. A violation of 10 *Del.C.*, chapter 45 cannot be supported by a solitary showing that blacks were underrepresented as a result of excusals granted for personal reasons or for cause.

■■■ Initially, prospective jurors are randomly selected from racially blind voter registration lists. Thereafter, those selected may be excused, *upon personal request*, only for hardship (10 *Del.C.*

§ 4507(c)) or if they belong to a class of persons for which a statutorily defined reason for excusal may be granted (10 *Del.C.* § 4504(b)(5)). On its face, this selection process is race neutral; and absent a *prima facie* showing that the exclusion of members of a distinctive racial group is inherent in the process, 10 *Del.C.*, chapter 45 is not implicated. As we stated in *Haas v. United Technologies Corporation*, Del. Supr., 450 A.2d 1173, 1183–1184, *appeal dismissed*, 459 U.S. 1192, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983), no defendant has an absolute right to a jury which includes members of his own racial group. *See also Taylor v. Louisiana*, 419 U.S. at 538, 95 S.Ct. at 701. To impose a racial quota system upon the Superior Court's random selection system would be redundant, if not unworkable. Given the nature of random selection, it is inevitable that a jury may on occasion fail to represent a fair cross-section of the community. Chapter 45 does not guarantee every defendant a perfectly representative jury.

Under the facts and circumstances of this case, the defendant has failed to make a *prima facie* showing that the jury's composition resulted from the systematic exclusion of blacks for racially motivated purposes. Absent such a showing, the defendant cannot attack the outcome of a fair jury selection process.

### B.

We turn to defendant's claim that a new trial is required because the State exercised three of its peremptory challenges exclusively on racial grounds. Defendant raises the issue on the following record: After the Trial Court completed its general *voir dire*, the jury was drawn from the remaining array, which then included five blacks. (See III A above). Of the prospective jur-

---

**6.** 10 *Del.C.* § 4501 provides:

It is the policy of the State that all litigants in state courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the county wherein the court convenes. It is further the policy of the State that all citizens shall have the opportunity to be considered for service on grand and petit juries in the courts of the State, and shall have an obligation to serve as jurors when summoned for that purpose.

ors drawn, two blacks and a greater number of whites were excused by the Court for cause due to their views on capital punishment. The parties then exercised their peremptory challenge rights. Defendant exercised all 20 of his permitted peremptory challenges; and the State exercised its 12 permitted challenges.[7] The State used three of its challenges to strike each of the three remaining black jurors. Defendant made no contemporaneous objection to the State's exercise of any of its peremptory challenges. Instead, after the jury had been finally selected, defendant made the following motion:

> **MR. YOUNG:** If it please the Court, *in something of a renewal of an earlier motion made,* we feel the potential panel yielded as was feared an all-white jury and we don't feel that is representative of the community and could not give a fair and impartial trial and therefore move to have the jury panel in its entirety as well as the jury panel seated stricken. (emphasis added)

The following colloquy ensued:

> **THE COURT:** Does the State have any comments?
>
> **MR. LIGUORI:** No, Your Honor.
>
> **THE COURT:** I have considered your motion. *I have considered the composition*—I have considered the fact there were—I believe you cited the statistics previously of the composition or makeup of the jury panel originally and your application is hereby denied. (emphasis added)

On appeal, defendant attacks for the first time the State's exercise of its peremptory challenges, stating that they were exercised for racial reasons in violation of defendant's Sixth Amendment right to be tried by a fair and impartial jury. Defendant further contends that the State's action violated 10 *Del.C.,* chapter 45. We reject such contention for two reasons, each related to the inadequacy of the record to support the claim. We conclude: (1) that no Sixth Amendment peremptory challenge claim was fairly presented to the Trial Court; but (2) even assuming the contrary, defendant failed to meet his burden of establishing a *prima facie* claim that the State exercised its peremptory challenges on racial grounds.

 Defendant contends that his pre-*voir dire* motion to strike the jury venire and his renewal of that motion after the jury was drawn were sufficient to permit him to raise on appeal the issue of discriminatory use of peremptory challenges. We cannot agree for it is clear from the trial record that defendant failed fairly to address the issue now raised. At no time did defendant challenge the State's use of its peremptory challenges or even imply that the State was exercising its challenge rights on racial grounds.

However, assuming the issue were preserved for appeal, defendant's claim must be rejected. On the merits, defendant asks this Court to adopt the holdings of *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), and *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499 (1979), *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979), on a record that would preclude their application. In both *Wheeler* and *Soares,* the defendants made *prima facie* showings of a substantial likelihood that the prosecution had exercised its peremptory challenges in a discriminatory fashion.[8] Thus, *Wheeler*

---

**7.** The right of peremptory challenge, a creature of statute rather than of constitution, exists perhaps more for the benefit of the defendant than the State. *McBride v. State,* Del.Supr., 477 A.2d 174, 189 (1984). They "are privileges which are subject to reasonable regulation as to the manner of their exercise." *Shields v. State,* Del. Supr., 374 A.2d 816, 820 (1977). *See also Hickman v. State,* 431 A.2d 1249.

**8.** In *Wheeler,* the State exercised its peremptory challenges to exclude every prospective black juror. Defense counsel objected to the State's use of its peremptory challenges and made a *prima facie* showing to the Trial Court that the challenges were used to systematically exclude blacks from the jury. 148 Cal.Rptr. at 895–897, 583 P.2d at 752–754. In *Soares,* the State excluded twelve of thirteen prospective black jurors through peremptory challenges. Defense

and *Soares* do not presume that a party is exercising its peremptory challenges on discriminatory grounds. Rather, a party's exercise of peremptory challenges "are not 'open to examination' unless and until on timely motion the Trial Court is satisfied there is a *prima facie* showing that jurors are being challenged on the sole ground of group bias.'" *Saunders v. State*, Del. Supr., 401 A.2d 629, 632 (1979), interpreting *Wheeler*.

Here, as in *Saunders*, defendant has failed to make the required *prima facie* showing. *Johnson v. State*, Del.Supr., 312 A.2d 630 (1973). In *Johnson*, a black defendant argued on appeal that the State prosecutor on *voir dire* systematically challenged prospective black jurors in a discriminatory manner. Of six eligible black persons, one was seated and the remaining five were peremptorily challenged. The Court ruled that, in the absence of a record showing both a "purposeful, deliberate exclusion" of black people and discriminatory intent on the part of the prosecutor, the Court will not speculate as to the State's motives in exercising its challenges. *Johnson, supra* at 631.

■ Exclusion of blacks, without more, is not *per se* evidence of discrimination. Here, there is *no* record evidence that the State prosecutor intended to exercise peremptory challenges in a racially discriminatory manner. In the absence of any such showing, "we may only conclude that the State used its peremptory challenges properly within its power." *Hooks v. State*, 416 A.2d at 196; *see also Johnson v. State, supra*.

Nevertheless, *Wheeler* and *Soares* demonstrate a void in our present trial court procedures for confronting future objec-

tions to the exercise of peremptory challenges on grounds of discrimination.

The *Wheeler* and *Soares* holdings also represent a response to the tremendous burden of proving under federal constitutional law an equal protection violation through a party's exercise of its peremptory challenges. The federal law's perceived inadequacy had its origin in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Swain*, the United States Supreme Court held that the prosecutor's use of peremptory challenges to exclude six black prospective jurors did not violate the defendant's Fourteenth Amendment equal protection rights. The Court went on to justify its conclusion:

> [w]e cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption ... must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome ... by allegations that in the case at hand all Negroes were removed ... because they were Negroes.

*Swain*, 380 U.S. at 222, 85 S.Ct. at 837. In dicta, however, the Court noted that a defendant could overcome the equal protection barrier by proving that the prosecutor engaged in a purposefully discriminatory, systematic exclusion of blacks over a period of time.[9] *Id.* at 223–224, 85 S.Ct. at 837–838. Many state courts have adopted *Swain*'s dicta as the applicable test for determining whether peremptory challenges have been exercised on invidious

---

counsel carefully established a record for appeal: "[E]ach time a prospective black juror was challenged by the prosecution, [the defendants] noted for the record the race of that individual, objected to the prosecutor's use of the peremptory challenge, and took exception to the judge's refusal to sustain their objection." 387 N.E.2d at 508 n. 8.

9. Defendant concedes that he cannot overcome the equal protection barrier of *Swain*. Therefore, defendant argues that we should adopt the approach of the *Wheeler-Soares* jurisdictions— by invoking the Sixth Amendment and avoiding *Swain*'s requirement of proving systematic exclusion based on repetitive conduct. As previously stated, the record is inadequate to establish cause for reversal by either avenue.

grounds. *McCray v. Abrams*, 2d Cir., 750 F.2d 1113, 1118 (1984).[10]

However, *Swain*'s formidable test for finding a denial of equal protection in the exercise of peremptory challenges has resulted in: (a) resort to a Sixth Amendment remedy;[11] (b) findings of state constitutional violations;[12] and (c) widespread criticism of *Swain*.[13] The most recent criticism of *Swain* appears in *McCray v. Abrams*, 2d Cir., 750 F.2d 1113 (1984). In *McCray*, the Court ruled that using peremptory challenges to systematically exclude jurors on grounds of race violates a party's Sixth Amendment right to a fair and impartial trial. The Second Circuit thereby joined California, Massachusetts, New York,[14] and Florida[15] in refusing to follow *Swain*.

We are persuaded by these authorities not to apply *Swain*'s equal protection test in determining whether a party's exercise of its peremptory challenges violates his adversary's right to a fair and impartial jury.[16]

Peremptory challenges, when appropriately exercised, are an essential tool for eliminating potential jury bias and must be available to any party, within constitutional limits. Those limits include the realistic possibility that a jury of one's peers will consist of a representative cross section of the community similar to the venire or panel from which the jury is chosen. *Accord McCray v. Abrams*, 750 F.2d at 1128–1129.

■■■■■ We therefore conclude that the use of peremptory challenges to exclude prospective jurors solely upon the basis of race violates a criminal defendant's right under *Del. Const.*, Art. I, § 7 to a trial by an impartial jury.

We also conclude that it is not only desirable but also necessary that this Court set out in general terms a procedure for trial

---

**10.** To our knowledge, in only one jurisdiction, Louisiana, has a defendant successfully established an equal protection violation in the state's exercise of peremptory challenges. *State v. Washington*, La.Supr., 375 So.2d 1162 (1979). *See* Annot., 79 A.L.R.3d 56, 73, Use of Peremptory Challenges to Exclude from Jury Persons Belonging to a Class or Race (1972); *see also U.S. v. Childress*, 8th Cir., 715 F.2d 1313, 1316 (1983).

**11.** Three years after *Swain*, the Supreme Court of the United States in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), held that the Sixth Amendment jury trial provisions are applicable to the states through the Fourteenth Amendment. Thereafter, in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690, it was held that the Sixth Amendment forbids the systematic exclusion of distinctive groups from venires from which criminal juries are chosen. In this manner, the Sixth Amendment was employed to extend the prohibition against discriminatory use of peremptory challenges to include jury venires and panels.

**12.** The rulings in *Wheeler* and *Soares* are based on state constitutional provisions. In contrast, this defendant's primary assertion is based on federal constitutional grounds.

**13.** Note, The Supreme Court, 1964 Term, 79 Harv.L.Rev. 103, 135–139 (1965); Comment, *Swain v. Alabama*: A Constitutional Blueprint for the Perpetuation of the All-White Jury, 52 Va.L.Rev. 1157 (1966); Note, Peremptory Chal-

lenge—Systematic Exclusion of Prospective Jurors on the Basis of Race, 39 Miss.L.J. (1967); The Prosecutor's Exercise of the Peremptory Challenge to Exclude Nonwhite Jurors: A Valued Common Law Privilege in Conflict with the Equal Protection Clause, 46 U.Cin.L.Rev. 554 (1977); Note, Limiting the Peremptory Challenge: Representation of Groups on Petit Juries, 86 Yale L.J. 1715, 1723 (1977); Recent Development, Racial Discrimination in Jury Selection, 41 Alb.L.Rev. 623 (1977); Brown, McGuire, and Winters, The Peremptory Challenge as a Manipulative Device in Criminal Trials: Traditional Use or Abuse, 14 New.Eng.L.Rev. 192, 196–202 (1978); Comment, Systematic Exclusion of Cognizable Groups by Use of Peremptory Challenges, 11 Fordham Urb.L.J. 927–948 (1982–1983); Saltzburg and Powers, Peremptory Challenges and the Clash Between Impartiality and Group Representation, 41 Md.L.Rev. 337–383 (1982); Note, The Prosecutor's Use of the Peremptory Challenge to Effect the Racial Composition of Juries, 50 Tenn.L.Rev. 385–402 (Winter 1983).

**14.** *People v. Thompson*, 79 App.Div.2d 87, 435 N.Y.S.2d 739, 745 (1981).

**15.** *State v. Neil*, Fla.Supr., 457 So.2d 481 (1984).

**16.** Article I, § 7 of the Delaware Constitution (the substantive equivalent of the Sixth Amendment) states in pertinent part: "In all criminal prosecutions, the accused hath a right to ... a speedy and public trial by an impartial jury...." *See also* 10 *Del.C.*, chapter 45, *supra*.

courts to follow in the future when they are fairly presented with a claim that peremptory challenges have been exercised on discriminatory grounds. In attempting to fashion a practical approach, we borrow heavily from *People v. Wheeler, supra, Commonwealth v. Soares, supra* and *McCray v. Abrams, supra.*[17]

■ We begin with the presumption that the State is properly using its peremptory challenges for constitutionally permissible purposes.[18] If at some time during *voir dire* the defendant reasonably believes the State is using its peremptory challenges in a racially discriminatory fashion, he must raise the issue in a specific and timely manner.[19] To rebut the presumption, the defendant must make a *prima facie* showing that, considering all circumstances in the given case, there is a substantial likelihood that the prospective jurors are being peremptorily challenged solely on the basis of race.[20] The defendant must make as complete a record of the circumstances as is practical, and he must establish that the excluded potential jurors are members of an identifiable racial group.

■ Once a *prima facie* showing has been made, the trial judge must determine whether there is a substantial likelihood that the prosecutor is exercising the State's peremptory challenges on the basis of race. A ruling in favor of the State will end any further inquiry. A ruling in favor of the defendant, however, will shift the burden to the State to prove that the exercised challenges were not racially motivated. To sustain this burden, the State's showing "need not rise to the level of the challenge for cause." Nevertheless, it must satisfy the court that its peremptory challenges were made on grounds of specific, individual juror bias, or on grounds reasonably related "to the particular case or trial or its parties or witnesses," and not solely on the ground of the jurors' race. *People v. Wheeler*, 583 P.2d at 765, 148 Cal.Rptr. at 907.

■ If the court then determines that the State has not met its burden, and the initial presumption is rebutted, the jury is deemed unrepresentative, and the court must dismiss those jurors already selected. "So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire—not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges." *Wheeler, supra* at 765, 148 Cal. Rptr. at 907. Accordingly, in such case a new venire must be drawn.

## IV

We turn to defendant's contentions that the Trial Court committed reversible error in denying defendant's two related pre-trial motions, *one,* for change of venue; ' and *two,* for sequestration of the jury through-

---

17. The *Wheeler* approach has been adopted by the courts in *Commonwealth v. Soares* and *McCray v. Abrams* with its major components essentially unaltered. In a later decision (*People v. Hall*, 35 Cal.3d 161, 197 Cal.Rptr. 71, 672 P.2d 854 (1983) (en banc) ), the California Supreme Court refused to eliminate the *Wheeler* procedures, finding no evidence that they were unworkable.

18. As the Court in *Wheeler* states:
"[W]e adopt this presumption for several reasons: in deference to the legislative intent underlying such challenges, in order to encourage their use in all proper cases, and out of respect for counsel as officers of the court." 148 Cal. Rptr. at 904–905, 583 P.2d at 762–763.

19. A motion for mistrial is an appropriate means of raising the issue given the relief requested is a new jury selection proceeding.

20. As an example, the following forms of evidence may be employed in establishing the existence of a "substantial likelihood" of the improper use of peremptory challenges:
(a) Defendant may show the State has challenged all the members of an identifiable racial group in the venire.
(b) Defendant may show the State used a disproportionate number of peremptory challenges against a particular racial group.
(c) Defendant may show the jurors challenged were homogeneous in only one respect—race.

out the trial. As to each issue, our standard of review is whether the Court abused its discretion in its rulings on these issues. We find no abuse of discretion.

### A.

One month after defendant's arrest in May 1982, and six months before the trial began in December 1982, defendant moved for change of venue under Superior Court Criminal Rule 21(a).[21] Defendant contended that extensive pre-trial news reporting of the crime had deprived him of his right to a fair and impartial trial in Kent County where the crime had occurred. Defendant asserted that it was "clear" that he could not receive a fair and impartial trial in light of: the seriousness of the pending charge; the relatively small population of Kent County—about 75,000 comprising some 31,000 households; and the "extensive and prejudicial" pre-trial publicity in the local daily newspaper, published in Dover, the county seat and capitol of Delaware.

In support of the motion, defendant relied on four newspaper articles concerning the crime. The articles covered a period of three months from the date of the murder in February to the following May. The first two articles did not mention defendant. The last two articles, however, did identify defendant as a suspect in the shooting death of the victim, the owner and operator of a Dover liquor store. One article, quoting testimony of codefendant Tyrone Baxter given at a preliminary hearing, identified defendant as having fired the first shot that struck victim in the knee. The articles also referred to Baxter's confession implicating defendant as having fired the fatal shot. The State opposed defendant's venue motion, arguing that the motion was premature as trial had not yet

been scheduled and that such motion should be deferred until the outcome of *voir dire* of the venire. Following a mid-August hearing, the Trial Court summarily denied defendant's motion for change of venue.

In early December 1982, on the eve of trial, defendant renewed his motion for change of venue. The motion was based on the same grounds previously asserted but was supplemented by two newspaper articles, one published in mid-August and the other in mid-November, 1982. Defendant added a further claim that his right to a fair trial would be impaired because the victim was Roman Catholic and Kent County included a "large" Roman Catholic community. The State again opposed the motion, denying that the case had achieved notoriety and asserting that *voir dire* would ensure a fair and impartial jury. The Court again denied defendant's venue motion in a bench ruling.

 The law is well established that routine pre-trial publicity of a criminal case will not justify the grant of a motion for change of venue. *See, e.g., United States v. Ringland,* 8th Cir., 497 F.2d 1250 (1974); *United States v. Green,* 9th Cir., 554 F.2d 372 (1977); *United States v. Bailleaux,* 9th Cir., 685 F.2d 1105 (1982). A change of venue will be granted only upon a showing of reasonable probability of prejudice. *Sheppard v. Maxwell,* 384 U.S. 333, 362–363, 86 S.Ct. 1507, 1522–1523, 16 L.Ed.2d 600 (1966); *McBride v. State,* Del.Supr., 477 A.2d at 185. To make such a showing, a defendant must present evidence of highly inflammatory or sensationalized pre-trial publicity sufficient for the court to presume prejudice if it finds the publicity to be inherently prejudicial. Short of such a

---

**21.** Rule 21(a) states, in pertinent part, that a change of venue of criminal prosecution to either of Delaware's two other counties is warranted if "there exists in the county where the prosecution is pending so great a prejudice against [defendant] that he cannot obtain a fair and impartial trial in that county." In *McBride, supra,* we ruled that Rule 21 "should be amended to eliminate the requisite showing by a de-

fendant that there exists 'so great a prejudice against defendant that he cannot obtain a fair and impartial trial in that county,'" 477 A.2d at 185, quoting *Parson v. State,* 275 A.2d at 871 (emphasis in original); and we directed that henceforth, "a change of venue [be granted] upon a showing that there exists a 'reasonable probability' or 'reasonable likelihood' of prejudice against a petitioner." 477 A.2d at 185.

showing, defendant must demonstrate actual prejudice through *voir dire*. *See United States v. Mandel*, D.Md., 415 F.Supp. 1033, 1067 (1976); *accord McBride, supra* at 185–186.[22] Whichever path is chosen, the decision to grant or deny a request for change of venue is a matter for the reasonable exercise of the trial court's discretion. *Parson v. State*, Del.Supr., 222 A.2d 326, *cert. denied*, 386 U.S. 935, 87 S.Ct. 961, 17 L.Ed.2d 807 (1967). We find no abuse of discretion.

■■■ Clearly a rational factfinder could conclude that the articles upon which defendant relied failed to meet the test for change of venue as recently restated by this Court in *McBride*:

> A defendant asserting a claim on prejudicial pretrial publicity must generally establish that the venire was actually prejudiced by pretrial media reports. However, as the United States Supreme Court held in *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) and this Court stated in *Parson v. State*, Del.Supr., 275 A.2d 777, 786 (1971), due process does not entitle a defendant to a trial by jurors ignorant of all facts surrounding the case.

> \* \* \* \* \* \*

> Yet, prejudice may be presumed when a moving party proffers evidence of highly inflammatory or sensationalized media coverage prior to trial. (citations omitted).

477 A.2d at 185.

Here, a rational factfinder could clearly conclude that the pre-trial news publicity cited by defendant had not "so saturated and inflamed the local community that the proceeding was reduced to a 'hollow formality' warranting the procedural safe-

guard of a change of venue. *Rideau v. Louisiana*, [373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963).]" 477 A.2d at 185.

### B.

Defendant next asserts that the Trial Judge abused his discretion in rejecting defendant's motion to sequester the jury throughout the trial. Defendant moved to sequester the jury based upon "the unlikelihood of [the jury] being free of media and personal contact regarding extra-judicial and uncontrollable influences regarding the within case." He argued that publicity surrounding the case, both before and during trial, required that the jury be sequestered throughout the trial in the interest of "fairness and impartiality." The Court denied defendant's motion, stating that sequestration of the jury would be confined to the period of its deliberations, and that otherwise the jury would be given daily instructions with respect to the media.

■■■ Delaware law is well settled that "[j]ury sequestration is a matter of judicial discretion." *Bailey v. State*, Del. Supr., 363 A.2d 312, 319 (1976), *cert. denied*, 429 U.S. 1072, 97 S.Ct. 809, 50 L.Ed.2d 790 (1977). Superior Court Criminal Rule 24(f) provides, "[t]here will be no sequestration of jurors, unless ordered by the Court." Jury sequestration is a matter of discretion and not of fundamental or constitutional right. *Young v. Alabama*, 5th Cir., 443 F.2d 854, 856 (1971), *cert. denied*, 405 U.S. 976, 92 S.Ct. 1202, 31 L.Ed.2d 251 (1972). The precise question raised by defendant was presented and disposed of in *McBride v. State, supra.* There, we stated:

> We thus adhere to our previous ruling in *Bailey v. State*, Del.Supr., 363 A.2d 312,

---

**22.** Proof of actual prejudice through *voir dire* must consist of more than a showing that one or more jurors have some preconceived notions concerning the defendant's guilt or innocence, or have heard or read of matters concerning the trial. *See McBride v. State, supra* at 185, quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961); *see also*

*State v. McKay*, Del.Super., 382 A.2d 260 (1978). A juror is sufficiently impartial and accordingly unaffected by potentially prejudicial media reports if the juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *McBride v. State, supra* at 185.

319 (1976), that absent a showing of actual prejudice, a trial court's refusal to sequester a jury constitutes neither reversible error nor an abuse of discretion. We find no abuse of that discretion here in that the defendant failed to establish any actual prejudice arising from inflammatory newspaper reports prior to or during her trial.

477 A.2d at 192–193. Here, too, defendant has failed to establish that any prejudice resulted from the pre-trial newspaper reports upon which he relied in his venue application. Indeed, when two potentially prejudicial news articles concerning the case were published during the trial, the Court questioned the jury collectively and concluded that no juror had been exposed to the news media accounts. Defendant asserts no claim that the Trial Court abused its discretion in following such procedures during the trial to ensure that the jury remained impartial and free from outside influence. *See Hughes v. State*, Del. Supr., 437 A.2d 559, 576–578 (1981). Clearly, the Trial Court cannot be found to have abused its discretion in denying defendant's motion to sequester the jury throughout the trial. *McBride v. State*, 477 A.2d at 193.

### V

We next consider defendant's claims of reversible error based on various evidentiary rulings of the Trial Court. Again, our standard of review is abuse of discretion. We find no abuse of discretion or prejudicial error.

### A.

We first address the Trial Court's refusal to appoint an investigator or a second attorney to assist defendant's court-appointed attorney. Defendant contends that the Court abused its discretion in denying defendant's motion under Superior Court Criminal Rule 44 for the appointment of co-counsel and for appropriation of funds to employ a private investigator.[23] Defendant argues that he was comparatively disadvantaged inasmuch as three Deputy Attorneys General represented the State and the Public Defender's Office, with its staff resources, represented codefendant Tyrone Baxter.[24]

Defendant contends that he was deprived of the effective assistance of counsel because his attorney was required to serve as both an investigator and defense counsel. Defendant asserted a need for a second attorney and for an investigator because the case was "complex," his life was in jeopardy, and his defense was alibi.[25]

Of the courts that have addressed the issue, there is near unanimity that the appointment of additional counsel or an investigator for an indigent criminal defendant is not a constitutionally protected right under federal or state law—absent a showing that such services are essential for an adequate defense. *State v. Anaya*, Me.Supr., 456 A.2d 1255 (1983); *accord State v. Parton*, 303 N.C. 55, 277 S.E.2d 410 (1981); *State v. Mines*, 35 Wash.App. 932, 671 P.2d 273 (1983); *State v. Peeler*, Ariz.App., 126 Ariz. 254, 614 P.2d 335 (1980); *see also Bailey v. State*, Del.Supr., 438 A.2d 877 (1981), and *Saunders v. State*, 401 A.2d at 633. In *Anaya*, the Supreme Court of Maine stated:

> Neither the state nor the federal constitution requires that an indigent defend-

**23.** Superior Court Criminal Rule 44 authorizes the Court to permit counsel for an indigent to incur "such necessary expenditures" as the Court authorizes for "transcripts, witness' travel expenses, or investigative, expert or other services necessary for an adequate presentation of his case."

**24.** Defendant Riley, though also indigent, could not be represented by the Public Defender because that office had been previously retained to represent indigent codefendant Baxter. The antagonistic positions of Riley and Baxter prevented their representation by the same office or attorney.

**25.** Defendant's alibi was that he was in Philadelphia, Pennsylvania when the crime occurred in Dover; therefore, he argued, he needed someone to go to Philadelphia to locate and interview potential alibi witnesses.

ant be provided with every service thought to be "reasonable" by attorneys with paying clients charged with serious crimes. As between rich and poor defendants, "absolute equality is not required; lines can be and are drawn." *Douglas v. California*, 372 U.S. 353 at 357, 83 S.Ct. 814 at 816 [9 L.Ed.2d 811] (1963). An indigent defendant has a constitutional right only to those services essential or necessary to an adequate defense. Therefore, we hold today that an indigent accused requesting public funds for experts must first show the trial court, to the extent he reasonably can then be expected to do so, why the services are necessary for an adequate defense; to appeal successfully from a denial of his request for funds, he must have been substantially prejudiced by the action of the trial court.

456 A.2d at 1263 (underlining added).

Defendant argued for a grant of funds to employ a private investigator, saying that it would be "less costly" for an investigator to go to Pennsylvania in search of witnesses to sustain defendant's alibi than it would be for defense counsel. On appeal, defendant has expanded the argument citing a further need to interview prospective prosecution witnesses for impeachment purposes. The Trial Judge was not informed that defense counsel would be unable to locate alibi witnesses but rather that it would be more economical for a private investigator to perform this work.

▇▇▇ In any event, defendant has failed to make the required showing (a) of essential need for the employment of a private investigator *and* (b) that substantial prejudice resulted from the lack thereof. Absent such showing, a ruling denying a request for investigative services will not be disturbed on discretionary grounds. *State v. Olin*, 103 Idaho 391, 648 P.2d 203, 207

(1982); *State v. Peeler*, 614 P.2d 335. Defendant's reliance on *Mason v. Arizona*, 9th Cir., 504 F.2d 1345 (1974), *cert. denied*, 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975), is misplaced.[26]

▇▇▇▇ By a parity of reasoning, we find no error of law or abuse of discretion in the Trial Court's denial of defendant's motion for appointment of additional counsel. To prevail upon such motion, defendant must show by clear and convincing evidence that he was prejudiced by the Trial Court's refusal to appoint co-counsel. *United States v. Reed*, 8th Cir., 658 F.2d 624, 628 (1981), *cert. denied*, 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982). Defendant's contention that the case presented complex factual or legal issues is rebutted by the record. The State's case rested primarily upon the testimony of two putative co-defendants, Tyrone Baxter and Michael Williams, buttressed by defendant's fingerprints found at the scene. The defense was a simple alibi: that defendant was not with either Baxter or Williams on the day of the crime but rather in Philadelphia. Neither party relied upon any extensive scientific or psychiatric testimony. Defense counsel had six months to prepare for the trial. *Compare Keenan v. Superior Court*, 31 Cal.3d 424, 180 Cal.Rptr. 489, 640 P.2d 108, *appeal dismissed*, 459 U.S. 937, 103 S.Ct. 246, 74 L.Ed.2d 194 (1982). Under the facts and circumstances of this case, there is clearly no merit in the contention that the Trial Court abused its discretion in refusing to appoint an investigator and co-counsel for defendant.

### B.

Defendant next asserts that the Trial Court abused its discretion in denying his request for two continuances—the first, to

26. In *Mason,* the court held that the allowance of investigative expenses for an indigent defendant is required only "when necessary" for the effective assistance of counsel. 504 F.2d at 1351. *Mason's* condemnation of "the denial of any and all defense services, regardless of need," to a court-appointed attorney as constituting a denial of equal protection is clearly inapplicable to the facts of this case where need and prejudice have not been shown. 504 F.2d at 1354.

obtain new counsel, and the second, to arrange for the attendance of alibi witnesses.

∎∎∎ Applications for continuances are traditionally left to the discretion of a trial judge whose ruling will not be disturbed on appeal unless clearly unreasonable or capricious. *Raymond Heartless, Inc. v. State,* Del.Supr., 401 A.2d 921, 923 (1979); *Hicks v. State,* Del.Supr., 434 A.2d 377, 381 (1981).

On the day that trial was scheduled to commence with the selection of the jury, the Court was informed (for the first time) that defendant wished to dismiss his court-appointed attorney (appointed six months earlier) and that defendant sought a continuance "for a day until his new counsel is available." Defendant informed the Court that his family intended to hire a private attorney to represent him when they had obtained the necessary funds to do so. The Court ascertained the name of the attorney whom the family had consulted, telephoned him and learned that he had not, in fact, been retained to represent defendant. The Court thereupon denied defendant's application and ordered the trial to proceed with court-appointed counsel or with defendant appearing *pro se* with appointed counsel on a stand-by basis. The Court further ruled that, in the event private counsel were retained for defendant, appointed counsel could be replaced at any time during the trial. Despite some apparent disagreement between counsel and defendant, the record reflects that court-appointed counsel ably represented defendant before and throughout the trial.

∎∎∎ The denial of a continuance for change of counsel on the eve of trial is not an abuse of discretion when: (1) there had been no previous complaint about counsel; (2) defendant had a prior opportunity to obtain substitute counsel; and (3) obtaining substitute counsel was uncertain and appeared to be a dilatory tactic. *Ungar v.*

*Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964);[27] *Hicks v. State,* 434 A.2d at 381; *Bass v. Estelle,* 5th Cir., 696 F.2d 1154 (1983).

∎∎∎ Under the circumstances of this case, the Trial Court clearly did not abuse its discretion in refusing defendant's request for a continuance beyond the time it took the Court to determine that there was no attorney ready and willing to enter an immediate appearance for defendant. During the previous six months of his representation by court-appointed counsel, defendant had not complained about his services. Nor, did he seek to retain a private attorney after the Court denied his request for court-appointed co-counsel. Given the circumstances under which the request for continuance was made, the Court's handling of the request was entirely reasonable and appropriate. *Raymond Heartless, Inc. v. State, supra* at 923. The defendant made not even a palpable showing of good cause for counsel's replacement. *United States v. Welty,* 3d Cir., 674 F.2d 185, 187–188 (1982).

∎∎∎ In the midst of trial, defendant requested an adjournment from Tuesday until the following Monday (a total of 2½ trial days). Defendant stated that he needed this time to arrange transportation for potential alibi witnesses to travel from Philadelphia to Dover—a distance of about 70 miles. The Court denied the request but granted a continuance until the following day. The purported alibi witnesses included defendant's sister and his girlfriend and, possibly, his mother. Defendant's relatives were able to be present at other portions of the trial but were purportedly unable to obtain transportation to Dover by the following day, notwithstanding the Court's grant of a one day continuance for that purpose. Broad discretion must necessarily be given trial courts on matters of continuance and, on the record in this case, the

---

**27.** In *Ungar,* the Supreme Court stated, "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." 376 U.S. at 589, 84 S.Ct. at 850.

Court's denial of defendant's application was neither unreasonable nor arbitrary. *See Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

### C.

Defendant next asserts that the Trial Court committed legal error in not requiring the State to disclose the recording from a wiretap placed on the telephone of Joyce Baxter, mother of codefendant Tyrone Baxter. Prior to trial, defendant moved for discovery of the recording as potentially exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At a pre-trial hearing on the motion, the State promised to supply all *Brady* material to defendant. In fact, the recordings had not been transcribed and the State's production of *Brady* material did not include the recording. Thereafter, in the course of trial, defense counsel again moved for disclosure of the recorded conversations. Defendant urged production under *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). The State resisted on two grounds: (1) that the recording was not material; and (2) that it had not been transcribed. The State further informed the Court that the wiretap had "developed nothing" and that defendant had neither been a party to any of the wiretapped conversations, nor had his name been mentioned. Defendant countered that the tapes could be potentially exculpatory through their failure to refer to defendant. The Court denied defendant's motion principally on the ground that, in the absence of a transcription, there was no written statement to be provided under *Jencks*.

Under *Brady*, evidence favorable to an accused must be disclosed if it is material to either guilt or punishment. However, materiality in the constitutional sense is not established "unless the undisclosed evidence would have created the 'reasonable doubt of guilt that did not otherwise exist.'" *Saunders v. State*, 401 A.2d at 632. As *Saunders* states, "[t]he mere possibility that an item of undisclosed information might have aided the defense, or might have affected the outcome of the trial," is insufficient to establish materiality. *Id.* In the context in which the *Brady* question was raised in this case, the record indicates that the Trial Court had assumed that the State complied with defendant's request for *Brady* material. When the question resurfaced at trial, the Court understandably focused upon the *Jencks* aspect of the application.

The preferable practice for resolving the *Brady* issue would have been for the Court to have determined the question of materiality of the evidence *in camera*, giving its ruling on materiality based on the factors as outlined in *Stokes v. State*, Del.Supr., 402 A.2d 376 (1979). However, through cross-examination of Mrs. Baxter, defendant apparently obtained essentially the same evidence that the recordings would have revealed: that defendant's name had not been mentioned over the telephone; and, indeed, that Mrs. Baxter did not even know defendant's name. Hence, there is no basis for reversible error under *Brady*.

We also find no reversible error under *Jencks*. On direct examination, Mrs. Baxter had testified that a man she did not know spent the night before the shooting at her home with her son, Tyrone. She identified that man in the courtroom as defendant. Defendant requested the wiretap transcript before Mrs. Baxter testified; and defendant never established that the recording was needed for purposes of cross examining Mrs. Baxter. Thus, production of the wiretap did not present a *Jencks* issue since the material was not essential for cross-examination of Mrs. Baxter. *Hooks v. State*, 416 A.2d at 200. At oral argument defendant conceded that disclosure was not required under *Jencks*.

### VI

We take up defendant's only exception to the Court's jury charge—its instruction on the presumption of innocence. Defendant

asserts that the Trial Court thereby committed legal error. The asserted error was the Court's refusal to supplement its charge on the presumption to include defendant's request that the jury be charged on the "evidentiary effect" of the presumption. The Court charged the jury as follows:

The law presumes all persons charged with a crime to be innocent. This presumption of innocence remains with a defendant throughout the trial, and should be given effect by you unless, after considering all of the evidence, you are then convinced that the defendant is guilty beyond a reasonable doubt.

Defendant contends that the Court erred in declining to further instruct the jury that: "the presumption of innocence is, in fact, evidence of innocence unless and until it is overcome by proof from the State."

Defendant has not provided the Trial Court or this Court with any authority to support his contention. He offers only the following reasoning: assuming the presumption of innocence to be evidence, it should be treated as any other rebuttable evidentiary presumption, that is, as "prima facie" *evidence* of defendant's innocence, subject to the State's ability to rebut it.

■ The argument fails because of its faulty premise. The presumption of innocence is not evidence of innocence to be admitted and weighed by the jury as other evidence. The presumption relates to the State's burden of persuading the fact-finder that defendant must be found guilty beyond a reasonable doubt or exonerated of the criminal charge. The presumption of innocence is simply "a way of describing the prosecution's duty both to produce evidence of guilt and to convince the jury beyond a reasonable doubt." *Taylor v. Kentucky*, 436 U.S. 478, 483 n. 12, 98 S.Ct. 1930, 1934 n. 12, 56 L.Ed.2d 468 (1978). Hence, the presumption is not evidence to

be weighed by a jury, and the Trial Court committed no error in declining to include defendant's flawed statement of law.

## VII

■ We turn to defendant's contention that his conviction of first degree intentional murder in violation of 11 *Del.C.* § 636(a)(1) [28] must be set aside because the evidence was insufficient as a matter of law to sustain the conviction.[29] Our standard of review is whether a rational trier of fact could find beyond a reasonable doubt the existence of every element of the offense of intentional murder in violation of § 636(a)(1). *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Holden v. State*, Del.Supr., 305 A.2d 320, 322 (1973).

Defendant contends that the facts are insufficient to sustain a conviction of intentional murder. He relies upon the following selected testimony: that defendant Riley and Baxter were in the process of leaving the liquor store (after taking the cash register receipts at pistol point, and wounding the store owner after he resisted surrendering his wallet) when the owner threw a bottle of wine at Riley; that Baxter was not looking when Riley fired the fatal shot; that later defendant told their third companion, Williams, that "out of instinct" he "shot the man."

■ However, we are required to view the evidence in a light most favorable to the State. *Henry v. State*, Del.Supr., 298 A.2d 327, 328 (1972). So viewed, the evidence fully supports a finding of intentional murder. The record contains evidence that defendant, along with his companion, Baxter, obtained a ride to the liquor store intending to commit an armed robbery, and that defendant entered the store, announced a holdup, and drew his pistol. When the victim resisted surrendering his wallet, defendant deliberately shot him in

**28.** See footnote 1, *supra.*

**29.** Defendant does not argue that there was insufficient evidence to sustain his conviction of

first degree felony murder in violation of 11 *Del.C.* § 636(a)(2) (see footnote 1, *supra* ).

the leg and started to leave. When the victim threw a bottle at him, defendant shot the victim in the chest at close range, inflicting a fatal wound.

Viewing the evidence in a light most favorable to the State, a rational trier of fact could reasonably conclude that defendant deliberately shot the shopkeeper a second time with the intent of causing death. Clearly, there was ample evidence to support a finding of intentional murder beyond a reasonable doubt. *Young v. State*, Del. Supr., 407 A.2d 517 (1979).

## VIII

We turn to defendant's claims of reversible error relating to the penalty phase of the proceeding held pursuant to 11 *Del. C.* § 4209.[30]

### A.

Defendant contests the State's dual use of the underlying felony—Robbery in the first degree—(1) to "elevate" the offense from a reckless killing (constituting Murder in the second degree under 11 *Del. C.* § 635) to a first degree felony murder offense in violation of 11 *Del. C.* § 636(a)(2), and (2) as an "aggravating circumstance" (murder committed in the course of robbery) to permit imposition of the death penalty under 11 *Del. C.* § 4209(e)(1)(j).[31]

Defendant argues that such dual use of the underlying felony of robbery is constitutionally prohibited because it places him in double jeopardy and subjects him to cruel and inhuman punishment.

In *Whalen v. State*, 492 A.2d 552, this Court recently addressed and rejected these constitutional claims (first raised here on appeal). *Id.* at 565–69. (Whalen, convicted of Rape in the first degree and Felony Murder in the first degree, 11 *Del. C.* § 636(a)(2) [murder by strangulation], similarly contended that it was unconstitutional "to use the underlying rape both as an essential element in his felony-murder conviction and as a statutory aggravating circumstance.") We must reject Riley's reliance upon the reasoning of *State v. Ahearn*, 59 N.C.App. 44, 295 S.E.2d 621, 624 (1982), *rev'd*, 307 N.C. 584, 300 S.E.2d 689 (1983), for the same reasons that we rejected Whalen's reliance upon *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979) (*see Whalen*, 492 A.2d at 566–68). The jurisdictions supporting our conclusions are set forth in *Whalen*, 492 A.2d at 568. Moreover, the North Carolina state courts have apparently given *Cherry* a narrow application for they have refused to apply its reasoning to a defendant convicted of intentional murder as well as felony murder. *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *reh'g denied*, —— U.S. ——, 104 S.Ct. 518, 78 L.Ed.2d 704 (1983).[32]

---

**30.** "Under Delaware's law, based on that approved by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), following a guilty verdict for First Degree Murder, a separate penalty hearing is conducted to determine whether the defendant will be sentenced to death or life imprisonment without probation or parole." *Whalen v. State*, Del.Supr., 492 A.2d 552, 559–560 (1985).

**31.** 11 *Del. C.* § 4209(e)(1)(j) provides:

(e) **Aggravating circumstances.**—(1) In order for a sentence of death to be imposed, the jury, unanimously, or judge when applicable, must find that the evidence established beyond a reasonable doubt the existence of at least 1 of the following aggravating circumstances which shall apply with equal force to accomplices convicted of such murder.

\* \* \* \* \* \*

**32.** In *Williams*, the defendant argued (as the defendant does here) that the trial court erred

in permitting the jury to consider the underlying felonies as aggravating circumstances where he was convicted of felony murder. In refusing to apply *Cherry*, the Court stated:

Here, however, the defendant was convicted of murder in the first degree on both the theory of premeditation and deliberation and the theory of murder in the perpetration of felonies. In such cases we have held that a *felony upon which a conviction for murder in the perpetration of a felony is based* may also be considered as an aggravating circumstance. (citations omitted).

*Williams*, 301 S.E.2d at 352.

J. The murder was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, arson, kidnapping, robbery, sodomy or burglary.

### B.

■ Defendant contends that the Trial Court committed legal error in not requiring the jury in the penalty hearing to determine who, as between Riley and Baxter, fired the fatal shot. Defendant argues that if the jury concluded that Baxter fired the fatal shot, then Riley's liability would be limited to that of an accomplice; and, under *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), he could not be executed absent evidence of either a plan to kill, intent to kill or an attempt to kill. As we stated in *Whalen*, *Enmund* did not abolish the death penalty for felony murder. Rather, this Court ruled the death penalty to be cruel and unusual punishment for a defendant "who was found guilty only vicariously as a felony murderer." 492 A.2d at 563; *see also id.* at 563 n. 7. The ruling in *Enmund* clearly has no application to this case. Unlike Enmund, Riley was not a mere accomplice as was Williams, for example, who merely awaited Riley and Baxter's return in a parked car. Here, the evidence placed Riley in the package store with a drawn pistol which he fired once to wound the victim before firing the fatal shot. As previously stated, Williams testified that Riley admitted having shot the storekeeper. Thus, unlike Enmund, Riley was not only present when the murder occurred but also carried it out, according to the only eyewitness testimony. Riley's presence at the killing distinguishes this case from *Enmund*. *Hall v. State*, Fla.Supr., 420 So.2d 872 (1982) (distinguishing *Enmund*, at 874); *Ruffin v. State*, Fla.Supr., 397 So.2d 277, 282, *cert. denied*, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981); *Stephens v. Kemp*, 11th Cir., 721 F.2d 1300 (1983); *Ross v. Hopper*, 11th Cir., 716 F.2d 1528 (1983). Finally, the fact that the jury found Riley guilty of intentional murder conclusively establishes the inapplicability of *Enmund* to this case.

### IX

With permission of the Court, the American Civil Liberties Union of Delaware, Inc. was granted leave to file a brief as amicus curiae. The amicus brief asserts five arguments for finding the death penalty imposed upon James Riley to be invalid. We take them up in the order raised.

### A.

■ The amicus argues that it was plain error for the Trial Court to permit the prosecutor in closing argument to state that the shopkeeper-victim was "defenseless" when the second fatal shot was fired. Amicus argues that the prosecutor thereby made reference to a statutory aggravating circumstance under 11 *Del. C.* § 4209(e)(1)(s) that the victim was "defenseless"—an aggravating circumstance which this Court found unconstitutionally vague in *State v. White*, Del.Supr., 395 A.2d 1082, 1090–1091 (1978). However, it is clear from the record that the prosecutor was using the term "defenseless" as a descriptive term and not as a statutory aggravating circumstance. Indeed, the jury had no reason to know that "defenseless" was a statutory aggravating circumstance as the Judge had given no instruction on the term. The term "defenseless" was clearly used in the context of a non-statutory aggravating circumstance which our penalty statute permits the jury to consider. 11 *Del. C.* § 4209(c)(4); *State v. White*, *supra* at 1088–1089. Given the evidence before the jury that the victim, a middle-aged man, had already been shot in the knee, we think the prosecutor's remarks were fair comment. *See Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

### B.

■ Amicus next contends that the Trial Court committed plain error in permitting the prosecution to present evidence of non-statutory aggravating circumstances under 11 *Del. C.* § 4209(c)(4). Amicus thereby asks this Court to reconsider one of its rulings in *State v. White, supra.*

There we held that it is permissible for the sentencing jury to consider aggravating circumstances "other than those listed in the Statute," 395 A.2d 1088, in determining whether to impose the death penalty. Amicus also ignores *Zant v. Stephens, supra,* and *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), which find no constitutional prohibition against considering non-statutory aggravating circumstances in death penalty cases. Moreover, our death penalty statute requires the consideration of "all relevant evidence ... which bears upon the particular circumstances or details of the offense." 11 *Del.C.* § 4209(d)(1)(b); *Flamer v. State,* Del.Super., 490 A.2d 104, at 136. We decline to reconsider and limit our ruling in *State v. White.*

### C.

Amicus next argues that it was plain error for the Court to have sentenced Riley to death when the jury, through an interrogatory, could have found him to have been only an accomplice to felony murder. The argument, based on *Enmund v. Florida, supra,* has been previously raised and disposed of under VIII B, above.

### D.

▮ Amicus next contends that it was plain error for the Trial Court to consider itself bound by the jury's finding of a statutory circumstance and its recommendation of death. Amicus argues that, in enacting 11 *Del.C.* § 4209(d)(1),[33] the General Assembly has improperly restricted the inherent sentencing power of the judiciary.

Stated another way, amicus argues that the death penalty statute constitutes an unconstitutional delegation of the judicial authority to sentence. However, amicus has failed to demonstrate that the determination of an appropriate sentence is a matter reserved exclusively for the judiciary. No authority is cited for the proposition and we know of none. Clearly, Superior Court Criminal Rule 35 (permitting a trial judge to order a reduction in sentence) may not be reasonably construed as authorizing a court to reduce a legislatively mandated minimum sentence. *United States v. Carter,* 9th Cir., 704 F.2d 1063 (1983). While the Legislature may permit rules of the judiciary to prevail over inconsistent statutes, such statutes relate to practice and procedure and not to the nature or length of a sentence for conviction of a crime.

### E.

▮ Finally, amicus contends that five improper remarks made by the prosecutor, both at the outset of the penalty hearing and in his closing argument, individually or cumulatively deprived defendant of a fair trial. Since defendant failed to object to any of the prosecutor's comments at trial, to constitute reversible error such remarks, individually or collectively, must have been so prejudicial as to establish manifest injustice or clearly deprive defendant of a substantial right. *Ward v. State,* Del.Supr., 366 A.2d 1194, 1197 (1976). Four of the criticized statements, while improper in varying degrees, represent misstatements of the kind we have addressed in previous cases and found, in the context of the whole trial, not to have risen to the level of

---

**33.** Subsection (d)(1) provides:

(1) A sentence of death shall not be imposed unless the jury or judge, where appropriate, finds:

a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and

b. Unanimously recommends, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. Where the jury, or judge when applicable, submits such a finding and recommendation, the Court shall sentence the defendant to death as provided by subsection (f) of this section. A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, sup-

constitutional error.[34] *Hooks v. State*, 416 A.2d at 203, 207.

The prosecutor's remaining remarks, asserted to be plain error, relate to a statement which he made to the jury at the beginning of the penalty hearing:

> Let me say at the outset that what you do today is automatically reviewed by our Supreme Court and that is why there is an automatic review on the death penalty. That is why, if you return a decision of death, that is why you will receive and have to fill out a two-page interrogatory that the Court will give you. This is an interrogatory that specifically sets out the questions that the State requests and whether or not you believe it beyond a reasonable doubt and if you want in your determination, if you believe the sentence should be death then each and every one of you has to sign this. This goes to the Supreme Court. That is why it is concise and we believe clear and it should be looked carefully on and answered appropriately.

The parties agree that mention of appellate review to a jury in a capital case is reversible error if made for the purpose of diminishing in a jury's eyes its role and responsibility for determining whether the punishment should be life or death. The parties disagree as to the construction and effect of the prosecutor's remarks in this case, a question of first impression in this Court.

Amicus argues that any comment of a prosecutor which suggests that the jury's decision is not final but is subject to subsequent review requires reversal for denial of a fair trial. Amicus relies primarily upon decisional law of Louisiana and North Carolina. *See State v. Willie*, La.Supr., 410 So.2d 1019, 1034–1035 (1982); *State v. Monroe*, La.Supr., 397 So.2d 1258, 1271 (1981); *State v. Berry*, La.Supr., 391 So.2d 406, 418 (1980); *State v. Jones*, 296 N.C. 495, 251 S.E.2d 425, 427 (1979). The State responds that amicus has overstated the law, contending that there is no absolute prohibition against referring at trial to the availability of appellate review, even in a death case. Moreover, the State argues that the context in which reference to appellate review is made is determinative. *State v. Berry, supra* at 418; *State v. Moore*, La.Supr., 414 So.2d 340, 347 (1982).[35]

The recently announced decision of the United States Supreme Court in *Caldwell v. Mississippi*, —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), is instructive here. In *Caldwell*, a jury-imposed death sentence was vacated because the prosecutor, in closing argument to the jury, "sought to minimize the jury's sense of the importance of its role." 105 S.Ct. at 2637. In response to defense counsel's argument to the jury that defendant's life rested in its hands and the "awesome responsibility" entrusted to the jury, the prosecutor expressed his "complete disagreement" with defendant's characterization of the jury's life or death role. The prosecutor argued, in part:

> Now, they would have you believe that you're going to kill this man and they

---

ported by the evidence, shall be binding on the Court.

**34.** The remarks of the prosecutor in question were:

> The State comes before you without hesitation and asks you to return a verdict of death....
>
> * * * * * *
>
> It is your duty as citizens.... It is all our duties as citizens to preserve law and order....
>
> * * * * * *
>
> [Each of us] has a duty and responsibility to prosecute ... within the law ... We are asking you to adhere to your responsibility to preserve law and order in our State and country.

 * * * * * *

The one person that we really haven't talked about this case to is James Feeley. We are bound as lawyers in the course of the trial not to comment on anything that has not been admitted into evidence so I can't tell you anything about Jim Feeley as a man or as a person. You are left to speculate whether he has feelings, desires—

**35.** The briefing of this question was completed in 1983–84.

know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. Yet they ...

**COUNSEL FOR DEFENDANT:** Your Honor, I'm going to object to this statement. It's out of order.

**ASSISTANT DISTRICT ATTORNEY:** Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.

**THE COURT:** Alright, go on and make the full expression so the Jury will not be confused. I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the Jury so they will not be confused.

**ASSISTANT DISTRICT ATTORNEY:** Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said "Thou shalt not kill." If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so. *Id.*, at 21–22.

105 S.Ct. at 2637–2638.

The majority of the United States Supreme Court in a five to three ruling held:

[I]t is constitutionally impermissible to rest a death sentence on a determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. This Court has repeatedly said that under the Eighth Amendment "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." (citations omitted)

&ast; &ast; &ast; &ast; &ast; &ast;

In the capital sentencing context there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court.

105 S.Ct. at 2639–2640. Reversal was also grounded upon: the prosecutor's erroneous and yet "unambiguous" conception of the role of the jury in capital sentencing procedures, which was "fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.' *Woodson v. North Carolina*, 428 U.S. [280] at 305 [96 S.Ct. 2978 at 2991, 49 L.Ed.2d 944] (plurality opinion)"; and the Trial Judge's open agreement with such erroneous remarks. 105 S.Ct. at 2645.

█ In contrast, in the case at bar the prosecutor's remarks in no way suggested that responsibility for ultimately determining whether defendant faced life imprisonment or death rested elsewhere. The prosecutor's passing comment to the jury that its decision would be "automatically reviewed" was fairly made in the context of the prosecutor's preceding reference to the "specific statute [controlling] a penalty hearing on a capital case." 11 *Del.C.* § 4209. Since subsection (g) of § 4209 mandates the "Automatic Review of Death Penalty by Delaware Supreme Court", the prosecutor in the instant case was simply quoting the statute. In no sense may it reasonably be said that the prosecutor was either misstating the law, misleading the jury as to its role, or minimizing its sentencing responsibility. "[T]he fact that the jury's determination is subject to appellate review, if not common knowledge, is in any event information concerning the judicial process that one would think the jury is entitled to know." *Caldwell*, 105 S.Ct. at 2651 (Rehnquist, J., dissenting).

Finding *Caldwell* to be clearly distinguishable from the instant case, we find no

reversible error in the prosecutor's challenged remarks.

## X

Finally, we take up the question of whether imposing the death penalty on Riley was comparatively proportionate to the penalty imposed in similar cases arising under § 4209 of Title 11. *See Bailey v. State*, Del.Supr., 490 A.2d 158, 174 (1984). As we noted in *Bailey*, failure to conduct a proportionality review is not in and of itself unconstitutional. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, as we also noted in both *Bailey* and *Flamer v. State*, Del.Supr., 490 A.2d 104 (1984), our Legislature has seen fit to require a proportionality review to determine whether the death penalty imposed on defendant Riley was comparatively proportionate to the crime of murder in the first degree for which he was convicted. The Legislature's command is found in 11 *Del.C.* § 4209(g)(2):

> The Supreme Court shall limit its review under this section to the recommendation on an imposition of the penalty of death and shall determine:
>
> a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.
>
> b. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–7 of this title.

We address subparagraph b first; that is, whether the evidence supports both the jury's finding of a statutory aggravating circumstance enumerated under § 4209(e) and the defendant's conviction of Murder in the first degree (felony murder) under 11 *Del.C.* § 636(a)(2). We have previously found the evidence sufficient to support defendant's conviction of intentional murder (part VII). Moreover, the defendant concedes the sufficiency of the evidence with respect to the felony murder charge (part VII, n. 29). It necessarily follows that the evidence also supports the jury's finding (by response to Court interrogatory) of the existence of a statutory aggravating circumstance, *i.e.*, that "the murder occurred during the commission of the felony of robbery."

■■■ We now address subparagraph a of § 4209(g)(2). Two inquiries are posed thereunder: (1) whether the jury's imposition of the death penalty was either arbitrary or capricious; and (2) whether the death penalty imposed was disproportionate to the penalty imposed in similar cases arising under the statute. Each question requires a consideration of "the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender." The State's evidence with respect to the statutory aggravating circumstances showed that the murder was committed while defendant was engaged in the commission of robbery. The non-statutory aggravating circumstances upon which the State relied were: defendant's prior criminal record as an adult (six offenses over a period of five years—assault, larceny, theft, aggravated assault, retail theft, and theft of $300); the victim's condition as defenseless and wounded when fatally shot; and the disparity in ages of the victim and defendant. Evidence offered as to mitigating circumstances was: that the actual killer was Baxter, the co-defendant; that Baxter received a less severe penalty (plea of guilty to accomplice to murder in the first degree); and that defendant's background indicated that he was a diligent worker, possessing a non-violent and good character.

Considering the entire record, as outlined above, we cannot find any basis upon which to conclude that the jury either arbitrarily or capriciously determined that the punishment should be death.

We turn now to the remaining question as to whether the death penalty imposed was disproportionate to the penalty recommended or imposed in similar cases arising under our statute. Thus, we must relate this case to our "universe" of cases. In *Flamer v. State*, supra, we defined our universe to include all first degree murder cases which have gone to trial and to a penalty hearing. 490 A.2d at 139, 140. The universe of such cases includes *Flamer* as well as the other case-synopses found in *Flamer*, 490 A.2d at 140–143, and which are otherwise listed in Appendices I and J of *Flamer*, 490 A.2d at 157, 158. To that universe we add the defendants in the four cases which have been tried since publication of *Flamer* on September 20, 1984. A brief synopsis of each of those cases is set out in Exhibit A, attached hereto.

From this "universe" of 28 cases, we conclude that we should limit our consideration to those cases in which the trier of fact found a statutory aggravating circumstance—that is, the 17 defendant-cases listed in Appendix J of *Flamer* [36], to which we add *Roop, Baynard, Lovett* and *Smart* from Exhibit A.

■ We encounter the same difficulty in making any meaningful comparison of the instant case with the facts and circumstances of the 21 cases in our universe that we expressed in *Flamer*, 490 A.2d at 143, 144. While a "definitive comparison of cases is almost impossible and necessarily touches upon the realm of speculation," 490 A.2d at 144, we conclude that the death sentence imposed upon Riley is not comparatively disproportionate to the sentences

imposed in our universe of comparable cases. We do find common characteristics between the death sentence imposed upon Riley and those imposed upon Whalen, Rush, Deputy, Flamer and Bailey. Those common characteristics include: an unprovoked, cold-blooded murder of a helpless person (or persons) committed upon victims lacking the ability to defend themselves and solely for purposes of pecuniary gain (except in Whalen's case). In none of these killings is there any evidence of provocation or of homicide committed out of passion or rage. In each case, except *Whalen*, the murder occurred in the course of a robbery that was deliberately planned and carried out with the use of deadly weapons. In each case, the perpetrators of these crimes offered no extenuating circumstances for taking the life of another; and, in this case, defendant's "alibi" appears so palpably false as to leave a rational trier of fact with no choice but to reject his entire defense.

This case appears to us to fit the mold of all other death penalty imposed cases (except *Whalen*) to date—an execution-type slaying of a helpless person in cold blood.

From our review of the judicial reports and factual background of these "similar" cases in our universe, we are satisfied that the imposition of death in this case was not disproportionate to the penalties imposed in the 21 other cases referred to above.

Therefore, the convictions and sentence are hereby AFFIRMED.

### *Exhibit A*
### FREDERICK JAMES ROOP, SR.

The pregnant victim in this case was living with defendant and their 4-year old son in an apartment in New Castle County.

---

**36.** Apart from Riley, the defendants whose cases are listed in Appendix J are:

DEATH PENALTY IMPOSED

| | |
|---|---|
| Frank C. Whalen | Billy Bailey |
| Andre Deputy | David Rush |
| William H. Flamer | |

STATUTORY AGGRAVATING CIRCUMSTANCE
FOUND–LIFE SENTENCE

| | |
|---|---|
| Judith McBride | Ballard Boatson |
| Frank L. Ross | James L. Bount, Jr. |
| Richard Massey | James W. Waller |
| Robert J. Martin | David W. Dodson |
| Tyrone Brookins | Charles F. Blizzard |
| Japhis Lampkins | Ronnie E. Cordell |

Defendant was aware of his wife's extramarital relationship with another man. On the day of the murder, defendant saw his wife and her paramour in his wife's car and pulled up behind them at a traffic light, at which time the paramour fled. The wife then followed husband to husband's place of business and tried unsuccessfully to explain why she and the other man were together. Upon arriving home later, defendant left his 4-year old son in his pick-up truck, went into the apartment, shot his wife with a .38 caliber handgun, and on the way out of the apartment told a cleaning lady, "Hey hon, call the police, I just killed my wife."

### WILLIAM BAYNARD

Defendant Baynard, while in the course of burglarizing the home of victim and her husband near Millsboro, shot and killed the victim with a .22 caliber revolver obtained from a cabinet drawer in the victim's kitchen. The murder occurred around noon. The victim had come from work during her lunch break and surprised the defendant, who had gained entrance by breaking a rear window.

### MELVIN SMART

Defendant Smart shot and killed his wife and her paramour in the couple's home in Seaford with a sawed-off shotgun. Defendant discarded the gun in a neighbor's yard, turned himself in at the police station and told the police dispatcher, "I just shot two people on Arch Street."

### JACKIE RAY LOVETT

Jackie Ray Lovett and codefendant, Charles A. Bower, shot and killed Richard A. Bull and Lori J. Todd, burned their possessions, and left both victims at the farmhouse scene covered with two large doors and a rug. The next day defendants returned to the scene, wrapped the victims in blankets, transported the bodies to Pocomoke, Maryland, and threw them into a creek with cinder blocks tied to them. Delaware State Police investigation revealed that victims were killed to revenge the victims' murders of two individuals, friends and purportedly part of a drug distribution ring headed by Lovett. Bower was arrested by Maryland State Police as a fugitive from Delaware. He confessed and implicated Lovett. Subsequently, Bower entered into a plea bargain.

\* \* \*

In each of these four cases, the penalty hearing jury declined to impose the death penalty. Therefore, each defendant received a life sentence without benefit of parole or probation. Two of the cases (*Roop* and *Smart*) involved so-called "crimes of passion"; *Lovett* involved a vengeance killing involving a drug distribution ring; and *Baynard* involved a homeowner killed with her own weapon in a surprised burglar situation.